John W. Leardi
Nicole P. Allocca
BUTTACI LEARDI & WERNER LLC
212 Carnegie Center, Suite 202
Princeton, New Jersey 08540
609-799-5150

Leslie Howard
COHEN HOWARD, LLP
766 Shrewsbury Ave., Suite 200
Tinton Falls, NJ 07724
732-747-5202

*Counsel for Plaintiff*

# DISTRICT COURT FOR THE
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH F. TAMBURRINO, M.D., as the attorney-in-fact for his patient S.A., | Case No. |
| *Plaintiff,* | |
| - v. - | **COMPLAINT** |
| AETNA LIFE INSURANCE COMPANY, MACQUARIE HOLDINGS (U.S.A.) INC., and MACQUARIE HOLDINGS (U.S.A.) INC. BENEFIT PLAN, | |
| *Defendants.* | |

Plaintiff Joseph F. Tamburrino, M.D. ("Dr. Tamburrino"), as the attorney-in-fact for his patient S.A. ("Plaintiff"), hereby brings this Complaint against Defendants Aetna Life Insurance Company ("Aetna"), Macquarie Holdings (U.S.A.) Inc. ("Macquarie Holdings"), and Macquarie Holdings (U.S.A.) Inc. Benefit Plan (the "Plan," "S.A.'s Plan," or the "Plan Defendant") (collectively, "Defendants"), and hereby alleges upon the personal knowledge S.A. and Dr. Tamburrino's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation made through his attorneys, as follows:

## THE PARTIES

1. With nearly two decades of experience in the fields of plastic and reconstructive

breast surgery, Dr. Tamburrino serves patients throughout the Greater Philadelphia area at Prestige Institute for Plastic Surgery, PC. Dr. Tamburrino is most often sought after for his techniques in breast reconstruction (utilizing DIEP flaps and implants).

2. After graduating from Temple University with a bachelor's degree in chemistry, Dr. Tamburrino went on to finish both his masters in biochemistry and his medical degree at Thomas Jefferson University. He then completed his general surgery residency at Temple University Hospital. Dr. Tamburrino went on to complete his plastic surgery residency at Cleveland Clinic Florida. Following this, he received fellowship training in microvascular breast reconstruction from the University of California at Los Angeles (UCLA). Dr. Tamburrino also attended a fellowship in aesthetic surgery at Lenox Hill Hospital in New York City.

3. Dr. Tamburrino is board certified by both the American Board of Plastic Surgery and the American Board of Surgery. He is most renowned for his innovative work with breast reconstruction for patients who have survived cancer.

4. At all times relevant hereto, S.A. was a "beneficiary," as defined by 29 U.S.C. § 1002(8), in an "Employee Health Benefit Plan," as defined by 29 U.S.C. § 1002(1), which was sponsored and administered by Macquarie Holdings. At all times relevant hereto, S.A. was a member of Aetna through her employer, Macquarie Holdings.

5. S.A. has designated Dr. Tamburrino as her "attorney-in-fact" for purposes of pursuing this claim. The instrument S.A. executed in favor of Dr. Tamburrino is attached hereto as **Exhibit A** (redacted).

6. Aetna is a health care insurance company. Its principal office is in Hartford, Connecticut. Aetna is a wholly-owned and controlled subsidiary of Aetna, Inc. that was established to fulfill the functions and purposes of Aetna, Inc. and to operate subject to the decisions and

guidelines of Aetna, Inc. Aetna handles pre-certification procedures, case management, claims processing, and review of denied claims that are appealed, and provides customer service for all these functions. Aetna also sets the terms and conditions for benefit claims procedures (for example, establishing the Recognized Charge) and manages provider networks. Aetna is also a fiduciary under ERISA, regarding the claims at issue in this litigation.

7. Plan Administrator Macquarie Holdings is the Plan's fiduciary, with a place of business in Houston, Texas.

8. Plan Defendant is a self-funded ERISA plan, meaning that Plan Defendant is a benefit plan of Macquarie Holdings. Thus, the benefits are not insured with Aetna or any of its affiliates but are to be to be paid from Macquarie Holdings' funds.

## JURISDICTION AND VENUE

9. Aetna's actions in administering employer-sponsored health care plans, including processing appeals of adverse benefit determinations, are governed by ERISA. Thus, subject-matter jurisdiction is appropriate over Plaintiff's claims under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

10. Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) based on Dr. Tamburrino maintaining an office in New Jersey at 51 Haddonfield Rd Ste 145 Cherry Hill, NJ 08002. Venue is also appropriate under 29 U.S.C. § 1132(e)(2) because Defendants may be found here and are authorized to do business in New Jersey, either directly or through wholly owned and controlled subsidiaries.

11. This Court has personal jurisdiction over Defendants because Defendants have substantial contacts with, and regularly conduct business in, New Jersey.

12. Pursuant to ERISA, this Court also has personal jurisdiction over Defendants because this Court has personal jurisdiction over any defendant who has been served in the United

States, regardless of whether the defendant has contacts to the forum state in which the court sits, so long the federal court sits in a district where the plan was administered or where the alleged breach took place.

## FACTS

13. In 2015, S.A. was diagnosed with breast cancer.

14. Breast cancer is a serious disability that affects one out of eight women nationwide.

15. In treating this diagnosis, S.A. received neoadjuvant chemotherapy, bilateral mastectomies, an immediate tissue expander reconstruction, and an expander to implant exchange.

16. After the expander to implant exchange, S.A. developed a wound dehiscence which required co-surgeons Dr. Tamburrino and Dr. Blechman to remove the bilateral implants, perform bilateral capsulectomies, and deep inferior epigastric perforator flap (DIEP) micro-surgical reconstruction. Later, it was determined that S.A. would need an additional surgery due to disproportion and deformity of bilateral reconstructed breasts and nipple areolar.

17. The specific terms of S.A.'s Plan provide coverage for breast reconstruction following a mastectomy, whereby the Plan incorporates Federal and State laws that have been adopted to protect women from abuses related to coverage for breast reconstruction following a mastectomy.

**A.    Specific Terms of the Plan and FAIR Health Calculation.**

15. Under the terms of the Plan, Aetna is obligated to make benefit payments when S.A. (an "Aetna Member") obtains health care treatment that is covered by the terms of the Plan (a "Covered Service").

16. The Plan defines "recognized charge" as "the amount of an out-of-network provider's charge that is eligible for coverage."

17. The Plan explains that the recognized charge for each service or supply is the lesser

4

of what the provider bills and "the reasonable amount rate" for professional services.

18. The Plan provides that the "reasonable amount rate" for professional services is "[t]he 80th percentile value reported in a database prepared by FAIR Health, a nonprofit company."

19. FAIR Health was established in October 2009 as part of the settlement of an investigation by the Office of the Attorney General of New York State into the health insurance industry's practice of determining out-of-network reimbursement based on data compiled and controlled by a major insurer, which the Attorney General determined was operating under a clear conflict of interest and was alleged to underpay out-of-network services. FAIR Health was subsequently formed "to establish and maintain a new database that could be used to help insurers determine their reimbursement rates for out-of-network charges and provide patients with a clear, unbiased explanation of the reimbursement process.

20. Using millions of healthcare claims submitted to it by insurers, health care plans, and providers, FAIR Health created a database that reflects the rates that most providers charge in each area. Publicly available on its website, a consumer can put in the zip code where a health care service is being provided and the Current Procedural Terminology ("CPT") Code to be used by the provider for each specific healthcare service. CPT Codes are numbers developed and licensed by the American Medical Association to identify each individual healthcare service for billing purposes.

21. Upon entry of the zip and CPT Code into the database, FAIR Health will provide the UCR for the pertinent procedure in the designated geographic area. As FAIR Health explains:

> The Estimated Charge is what FAIR Health, based on its database, estimates that a medical provider in your area may bill for the procedure you selected when performed out-of-network. This estimate is based on the charges billed by providers for this service in the geozip where the service was performed. (A geozip, which

5

defines a geographic region in our database, generally corresponds to the first three digits of a zip code.)

The estimate shown is based on the 80th percentile, meaning that 80% of the charges in our database for this procedure in your area were lower than or equal to our estimate and 20% were higher than or equal to our estimate. We use the 80th percentile because many insurers use the 80th percentile to determine usual, customary and reasonable (UCR) rates upon which they base out-of-network reimbursement.

22. FAIR Health has become the gold standard in determining out-of-network pricing for services rendered to patients insured through benefit plans that contemplate UCR (as opposed to Medicare-based) pricing.

23. Under the section entitled "Reconstructive or Cosmetic Surgery and Supplies," the Plan explicitly provides that "[c]overed expenses include charges made by a physician, hospital, or surgery center for reconstructive services and supplies," including but not limited to the following:

- Surgery needed to improve a significant functional impairment of a body part.
- Surgery to correct the result of an accidental injury, including subsequent related or staged surgery, provided that the surgery occurs no more than 24 months after the original injury. For a covered child, the time period for coverage may be extended through age 18.
- Surgery to correct the result of an injury that occurred during a covered surgical procedure provided that the reconstructive surgery occurs no more than 24 months after the original injury.

24. Relatedly, under the section entitled "Reconstructive Breast Surgery", the Plan explicitly provides that breast reconstruction surgical procedures are covered service under the Plan. Specifically, the Plan expressly states:

**Covered expenses** include reconstruction of the breast on which a mastectomy was performed, including an implant and areolar reconstruction. Also included is surgery on a healthy breast to make it symmetrical with the reconstructed breast and physical therapy to treat complications of mastectomy, including lymphedema.

**B.      Women's Health Cancer Rights Act of 1998 ("WHCRA") 29 U.S.C. § 1185b.**

6

25. Under the WHCRA, adopted as part of ERISA, once an ERISA plan provides coverage for a mastectomy (as does S.A.'s Plan), coverage is required to be provided for breast reconstruction in a manner determined by the member and her physician.

26. The WHCRA (i) requires that post-mastectomy breast reconstruction surgery be covered under the terms of Aetna plans; and (ii) prohibits claims administrators—like Aetna—from placing unreasonable restrictions or limitations on reimbursement for post-mastectomy breast reconstruction.[1] Explicitly, WCHRA emphatically states:

> (a) **In general.** A group health plan . . . shall provide, in case of a participant or beneficiary who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with such mastectomy, coverage for –
>
>> (1) all stages of reconstruction of the breast on which mastectomy has been performed . . . in a manner determined in consultation with the attending physician and the patient. Such coverage may be subject to annual deductibles and coinsurance provisions as may be deemed appropriate and as are consistent with those established for other benefits under the plan or coverage . . .
>
> (c) **Prohibitions.** A group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not –
>
>> (2) penalize or otherwise reduce or limit the reimbursement of an attending provider,
>
> (d) **Rule of construction.** Nothing in this section shall be construed to prevent a group health plan or a health insurance issuer offering group health insurance coverage from negotiating the level and type of reimbursement with a provider for care provided in accordance with this section.

27. The structure of this statute is straightforward. 29 U.S.C. § 1185b(a) requires that post-mastectomy breast reconstruction surgery be *covered*. 29 U.S.C. § 1185b(c) prohibits any restrictions or limitations on the *reimbursement rate* for this type of surgery, whether performed

---

[1] Notably, WHCRA applies to post-mastectomy breast reconstruction ***even in the absence*** of a diagnosis of breast cancer.

by an in-network surgeon or an out-of-network surgeon, as compared to other types of (non-emergency) surgery where a plan or insurer may reimburse based on an out-of-network reimbursement methodology. However, 29 U.S.C. § 1185b(d), provides an exception to the strict requirement of 29 U.S.C. § 1185b(c): the plan or insurer may negotiate a lower reimbursement amount with the provider.

28. Therefore, the Plan must provide coverage for breast reconstruction after a mastectomy under WHCRA.

29. Accordingly, pursuant to the section entitled "Notice Regarding Women's Health and Cancer Rights Act," the Plan unequivocally reads:

> Under this health plan, as required by the Women's Health and Cancer Rights Act of 1998, coverage will be provided to a person who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with the mastectomy for:
>
> (1) all stages of reconstruction of the breast on which a mastectomy has been performed;
> (2) surgery and reconstruction of the other breast to produce a symmetrical appearance;
> (3) prostheses; and
> (4) treatment of physical complications of all stages of mastectomy, including lymphedemas.

**C.**     **April 12, 2017, Date of Service.**

30. After receiving a positive diagnosis of right breast cancer, S.A. underwent neoadjuvant chemotherapy, bilateral mastectomies followed by immediate tissue expander reconstruction.

31. In 2016, S.A. underwent expander to implant exchange. Shortly thereafter, S.A. required the breast implant pocket being opened, washed out, and a new implant. However, S.A. again developed a wound dehiscence with exposed right breast implant and draining sinus.

32. On December 27, 2016, at Our Lady of Lourdes Medical Center, co-surgeons Dr. Tamburrino and Dr. Blechman removed the bilateral implants, performed bilateral capsulectomies and deep inferior epigastric perforator flap (DIEP) micro-surgical reconstruction.

33. However, it was later determined that S.A. required additional surgery due to disproportion and deformity of bilateral reconstructed breasts as well as nipple areolar reconstruction.

34. On March 21, 2017, Aetna issued a preauthorization to Dr. Tamburrino under authorization number 99772149000000 for these services to be performed.

35. On April 12, 2017, Dr. Tamburrino performed the preauthorized procedures, whereby Dr. Tamburrino's services were billed and paid as follows:

| CPT | Description | Billed Amount | 80% FairHealth | Paid Amount |
|---|---|---|---|---|
| 19350-RT | Breast Reconstruction | $11,834.81 | $27,875.00 | $713.12 |
| 19350-LT | Breast Reconstruction | $11,834.81 | $27,875.00 | $713.12 |
| 14001 | Tissue Transfer of Skin System | $11,467.82 | $2,416.00 | $312.90 |
| 19380-RT | Revision of Reconstructed Breast | $11,089.91 | $5,100.00 | $763.00 |
| 19380-LT | Revision of Reconstructed Breast | $11,089.91 | $5,100.00 | $1,625.25 |
| 15770-RT | Graft Procedure | $9,654.58 | $2,195.00 | $605.85 |
| 15770-LT | Graft Procedure | $9,654.58 | $2,195.00 | $605.85 |

36. Thus, of the total billed amount of $76,626.42, Defendants paid $5,339.09, *representing less than 7%* of billed charges and leaving S.A. with out-of-pocket responsibility of $71,287.33.

9

37. On May 30, 2017, Aetna issued an Explanation of Benefit ("EOB"), whereby Aetna provided a contradictory explanation for its under-reimbursements of Dr. Tamburrino's services, stating, "[the member's plan provided benefits for covered expenses at the prevailing charge level for the service in the geographical area where it is provided." However, the EOB also asserted: "The member's plan provides coverage for charges that are reasonable and appropriate. This procedure has been paid at the reasonable and customary rate."

38. Notably, the "prevailing charge level," "reasonable and appropriate," and "reasonable and customary" reimbursement rates neither appear nor are identified as the correct calculation methods for Dr. Tamburrino's services under S.A.'s Plan. Even if these rates appeared in the Plan, Aetna could not have possibly paid all three distinct rates simultaneously.

39. Plaintiff filed an appeal under the Plan to Defendants concerning the amount of Defendants' reimbursement of Plaintiff's bill on October 10, 2017.

40. Upon information and belief, Aetna did not respond to this appeal.

41. Although Plaintiff submitted a second appeal, Aetna demonstrated that appeals were futile by failing to respond to the first appeal. Aetna also stated in a subsequent letter that it considered the original decision to be final and that Plaintiff had exhausted its administrative remedies and could maintain an action under ERISA.

42. Consequently, Aetna has failed to reimburse Plaintiff under the terms of the Plan, in violation of ERISA.

43. Specifically, Defendants very plainly failed to reimburse Dr. Tamburrino for the lesser of what the provider bills (i.e. $76,626.42) and "the reasonable amount rate" for Dr. Tamburrino's professional services (i.e. $72,756.00, which represents "[t]he 80th percentile value reported in a database prepared by FAIR Health").

44. Thus, Defendants' underpayment for Dr. Tamburrino's services directly contradict the terms of the Plan.

48. Under ERISA, when an insurer, claims administrator, or plan fails to follow the procedures set out in the Plan, as here, the claimant is deemed to have exhausted his administrative remedies.

49. The Plan sets this requirement out. It states: "[I]f Aetna, or the Plan or its designee, does not strictly adhere to all claim determination and appeal requirements under applicable federal law, you are considered to have exhausted the Plan's appeal requirements."

50. Deemed exhaustion is set out in 29 C.F.R. § 2560-503-1, which states:

> [I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

53. The Plan Defendant is a fiduciary, and under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104 (a)(1)(B), it must discharge its duties solely in the interest of Plan participants and beneficiaries like Patient SA. It cannot permit its claims administrator to make claims determinations that would violate the terms of its SPD.

54. In this case, the Plan Defendant breached its fiduciary duties under ERISA by permitting Defendant Aetna to make the reimbursement determination for Patient S.A., a participant of the Plan, in violation of the Plan's SPD.

**COUNT I**
**Against All Defendants**
**(Claim for Plan Benefits Under 29 U.S.C. § 1132(a)(1)(B))**

55. Dr. Tamburrino incorporates by reference the preceding paragraphs in this Complaint as though such paragraphs were fully stated herein.

56. S.A. was eligible for benefits under the Plan.

57. By failing to adequately pay benefits to Dr. Tamburrino for services provided to S.A., the Defendants wrongfully violated obligations set forth in the Plan, and such underpayments were arbitrary, capricious, and manifestly mistaken.

58. Because S.A. is a beneficiary under the Plan, and because Dr. Tamburrino is the attorney-in-fact for S.A. with respect to the benefit claims here in issue, Dr. Tamburrino has standing to bring this cause of action on behalf of S.A. under 29 U.S.C. § 1132(a)(1)(B) to recover benefits due to S.A. under the terms under the Plan, enforce rights created by the Plan, and clarify his rights to future benefits under the terms of the Plan.

**WHEREFORE,** Dr. Tamburrino, as a duly-appointed authorized representative and attorney-in-fact of its patient S.A., demands judgment against Defendants, as follows: (a) directing Defendants to adequately pay benefits relating to the services provided to S.A.; (b) ordering Defendants to reprocess all wrongfully denied appeals in compliance with plan terms and without the improper reductions described herein; (c) prejudgment interest under the New Jersey prompt pay law; (d) attorney's fees pursuant to 29 U.S.C. § 1132(g)(1); (e) costs pursuant to 29 U.S.C. § 1132(g)(1); and (f) such other and further relief as the Court may deem equitable and just.

### CERTIFICATION PURSUANT TO LOCAL CIVIL RULES 11.2 AND 40.1

I hereby certify that, to the best of my knowledge, the matter in controversy is not the subject of any other pending or anticipated litigation in any court or arbitration proceeding, nor are there any non-parties known to Plaintiff that should be joined to this action. In addition, I recognize a continuing obligation during this litigation to file and to serve on all other parties and with the Court an amended certification if there is a change in the facts stated in this original certification.

(*Signature on Next Page*)

DATED: February 11, 2022                    Respectfully submitted,

                                            /s/ Nicole P. Allocca
                                            Nicole P. Allocca

                                            Nicole P. Allocca, Esq.
                                            BUTTACI LEARDI & WERNER, LLC
                                            212 Carnegie Center, Suite 202
                                            Princeton, New Jersey 08540
                                            609-799-5150
                                            *Attorneys for Plaintiff*
                                            *Princeton Neurological Center, P.C.*

                                            Leslie Howard
                                            COHEN HOWARD, LLP
                                                766 Shrewsbury Ave., Suite 200
                                                Tinton Falls, NJ 07724
                                            732-747-5202

13

# EXHIBIT A

## NEW JERSEY DURABLE POWER OF ATTORNEY

## OF



**NOTICE:** The powers granted in this document are broad. They are explained in the Revised Durable Power of Attorney Act. If you have questions about this document, you are encouraged to obtain competent legal advice. This document **does not** authorize anyone to make medical or healthcare decisions for you. You may revoke this durable power of attorney if you later wish to do so. This durable power of attorney is effective immediately and shall not be affected by subsequent disability or incapacity of the principal or lapse of time. This durable power of attorney is terminated by (1) my death; (2) the death of the attorney-in-fact named below in the first paragraph of this instrument; or (3) the occurrence of an event described in N.J.S.A. 46:2B-8.5 or 46:2B-8.10.

I, ▬▬▬▬▬ ("Principal") with an address of ▬▬▬▬▬ make, constitute, and appoint

**Joseph Tamburrino, M.D.** with an address of **Joseph Tamburrino, M.D., 800 W. State Street Doylestown, PA, 18901** as my attorney-in-fact.

### ARTICLE I

I hereby give and grant unto my said attorney-in-fact full power and authority to act for me in any lawful way with respect to the powers enumerated in Article II of this instrument.

### ARTICLE II

My attorney-in-fact is authorized to act for me in my name, place, and stead and may exercise any or all of the powers contained in this article.

The general powers I am granting unto my attorney-in-fact are all of those powers needed, desired, or which could prove beneficial, expedient, and/or useful, to enable my attorney-in-fact to lessen and/or eliminate any indebtedness, obligation, or financial liability owed by me to **Tamburrino Plastic Surgery & Med Spa** as successor in interest to **Prestige Institute for Plastic Surgery PC** through recovering reimbursement and/or receiving monies from any party from which I am owed monies and/or from which I could seek to receive monies from that is in any way related to the healthcare services that have been and/or will be rendered to me by **Prestige Institute for Plastic Surgery PC** and its employees, members, and owner(s), at any time, and includes, but is not limited to, seeking past due contractual benefits, penalties, interest, and reimbursement of legal fees, costs, and expenses that I and/or my attorney-in-fact incurred.

**2.1 Release and Receive Personal Health Information ("PHI").** With regard to disclosure of my PHI, my attorney-in-fact shall have the **power** to: (1) disclose any and all of my PHI, using reasonable care, as needed in the service of exercising, fulfilling, and/or in furthering the general purpose of this instrument through the exercising of those powers granted herein; and (2) receive any and all documents containing my PHI necessary to further the general purpose of this instrument through the exercising of those powers granted herein from any party including, but not limited to, my employer, plan administrator, plan sponsor, claims administrator, third-party administrator, claims repricer, other healthcare professionals, and the other such similar parties or entities.

**2.2 Requesting Insurance Plan and Related Documents.** With regard to requests for certain documents, my attorney-in-fact shall have the **power** to: (1) request and receive those documents so specified at 29 U.S.C. § 1024(b)(4), for example, my plan's summary plan description, trust agreement, and instruments under which the plan

is established or operated; and (2) request and receive any other documents which I am entitled to request and receive from any party.

**2.3 Appeals, Advisory Opinions, and Other Remedies.** With regard to any appeals, advisory opinions, and other remedies available to me under my insurance plan, applicable state, federal, or other law, statute, rule, case law, or regulation, my attorney-in-fact has the **power**, but not the obligation, to: (1) perform and/or engage in any and all required or voluntary appeals under my health insurance plan; and (2) perform and/or engage in any all available remedies, including, but not limited, referrals to the appropriate administrative agency, e.g., the Department of Banking and Insurance or the United States Department of Labor, file complaints, and seek advisory opinions.

**2.4 Claims and Litigation.** With regard to claims and litigation that are in any way related to the healthcare services that have been and/or will be rendered to me by **Prestige Institute for Plastic Surgery PC** and its employees, members, and owner(s), at any time, my attorney-in-fact has the **power** to: (1) assert and prosecute before a court or administrative agency a claim, a claim for relief, a counterclaim, or an offset or defend against an individual, a legal entity, or a government, including suits to recover property or other things of value, to recover damages sustained by me, to eliminate or modify tax liability, or to seek an injunction, specific performance, or other relief; (2) bring an action to determine adverse claims, intervene in an action or litigation, and act as amicus curiae; (3) in connection with an action or litigation, procure an attachment, garnishment, libel, order of arrest, or other preliminary, provisional, or intermediate relief and use an available procedure to effect or satisfy a judgment, order, or decree; (4) in connection with an action or litigation, perform any lawful act I could perform, including acceptance of tender, offer of judgment, admission of facts, submission of a controversy on an agreed statement of facts, consent to examination before trial, and bind me in litigation, provided, however, that my attorney-in-fact cannot sign an affidavit attesting to my personal knowledge; (5) submit to arbitration, settle, and propose or accept a compromise with respect to a claim or litigation; (6) waive the issuance and service of process on me, accept service of process, appear for me, designate persons on whom process directed to me may be served, execute and file or deliver stipulations on my behalf, verify pleadings, seek appellate review, procure and give surety and indemnity bonds, contract and pay for the preparation and printing of records and briefs, or receive and execute and file or deliver a consent, waiver, release, confession of judgment, satisfaction of judgment, notice, agreement, or other instrument in connection with the prosecution, settlement, or defense of a claim or litigation; (7) pay a judgment against me or a settlement made in connection with a claim or litigation and receive and conserve money or any other thing of value paid in settlement of or as proceeds of a claim or litigation; and (8) do any and all those things that I could do in the claims or litigation process except as specifically excluded as specified above in **2.4(4)**.

**2.5 Attorney-in-fact's Choice of Legal Counsel or Other Representatives and Their Remuneration.** With regard to the exercise of any power otherwise set forth in this instrument, my attorney-in-fact has the **power** to: (1) obtain legal counsel and/or other representatives of their choice, without my approval or knowledge, as they see fit. In no event shall the costs associated with my attorney-in-fact's chosen legal counsel and/or other representatives become an additional source of indebtedness, obligation, or financial liability owed by me.

## ARTICLE III

The enumeration of particular powers under a general power set out in this instrument is not intended in any way to limit the more general statement of power granted, but rather is intended to be in addition thereto and by way of example thereof.

## ARTICLE IV

My attorney-in-fact shall not be liable for any acts or decisions made in good faith and in conformity with the powers enumerated in this instrument. However, my attorney-in-fact shall not be relieved from liability for breach of duty committed dishonestly, with improper motive, or with reckless indifference to me or the purposes of this instrument.

Specifically, I wish to have it known that I understand, acknowledge, anticipate, and accept that my attorney-in-fact, in taking actions under this instrument to fulfil its general purpose, will do so with the aim of receiving monies owed to me so that said monies can be used to lessen and/or eliminate any indebtedness, obligation, or financial liability owed by me to **Tamburrino Plastic Surgery & Med Spa** as successor in interest to **Prestige Institute for Plastic**

Surgery PC and that my attorney-in-fact has a financial interest in **Tamburrino Plastic Surgery & Med Spa** as successor in interest to **Prestige Institute for Plastic Surgery PC.**

Additionally, I explicitly state that attorney-in-fact does not have any affirmative duty whatsoever to act or refrain from acting under this instrument or otherwise to (1) lessen and/or eliminate and indebtedness, obligation, or financial liability owed by me to **Tamburrino Plastic Surgery & Med Spa** as successor in interest to **Prestige Institute for Plastic Surgery PC**; or (2) for any other purpose.

## ARTICLE V

No attorney-in-fact acting hereunder shall be entitled to a fee for so acting and shall not be entitled to reimbursement of expenses reasonably incurred on my behalf pursuant to the authority granted in this power of attorney **except** as set forth in Article 2.5.

I am fully informed as to all the contents of this document and understand the full import of this grant of powers to my attorney-in-fact.

Signed on 7/1/21 July 1st, 2021
MONTH / DATE / YEAR

_____, Principal
PRINT NAME

_____ Witness

## CERTIFICATE OF ACKNOWLEDGMENT OF NOTARY PUBLIC

STATE OF NEW JERSEY )
                    ) ss.
COUNTY OF Camden    )

BE IT REMEMBERED that on this 1st day of July, 20 21, before me, the subscriber, personally appeared _____ who, I am satisfied, is the person named in and who executed the instrument, and thereupon they signed, sealed, and delivered the same as their act and deed, for the uses and purposes therein expressed.

_____
NOTARY PUBLIC

My commission expires: 02/17/2022

Rafael J. Calderon
Notary Public
New Jersey
My Commission Expires 02-17-2022
No. 50054898

Page 3 of 3